Argued and submitted November 24, 1997, reversed and remanded
February 4, 1998

## STATE OF OREGON,
*Respondent,*

*v.*

## GEORGE ATKESON,
*Appellant.*

## (960543194; CA A95913)

954 P2d 181

Lisa J. Ludwig argued the cause and filed the brief for appellant.

Kaye E. Sunderland, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LEESON, J.

## LEESON, J.

Defendant appeals from judgment entered after his conviction for endangering the welfare of a minor. ORS 163.575(1)(a). We review for errors of law, ORS 138.040, and reverse.

The victim, who was fourteen years old at the time of the events in this case, lived across the street from defendant, who was the victim's mother's ex-boyfriend. The victim's mother and defendant lived together for most of the victim's life, and the victim testified that defendant was like a step-father to her. The victim and her mother had recently moved out of defendant's residence and were sharing a house with defendant's brother, Randy Atkeson (Randy). The victim testified that, while Randy was in jail, she and her mother looked through Randy's backpack and found five pairs of the victim's underwear, which caused them some concern. Subsequently, an unidentified person told the victim over the telephone that defendant had a homemade videotape that, in part, recorded Randy while he was masturbating.

The victim testified that on February 28, 1996, she went to defendant's home to pick up some blue jeans that she had left there when she and her mother moved out and to ask defendant about the videotape. The victim asked defendant four or five times to see the videotape, claiming that she had a "right to know" about the man with whom she and her mother were sharing a house. Defendant showed the victim approximately five seconds of the videotape. Defendant then called Portland Police Detective Copp and told him that he had "made a mistake" by showing the victim the videotape. Defendant subsequently gave Copp the videotape, Copp investigated the offense, and defendant was indicted for endangering the welfare of a minor, ORS 163.575(1)(a), and furnishing obscene materials to minors, ORS 167.065(1)(a). The trial court granted defendant's demurrer with respect to ORS 167.065(1)(a), based on our opinion in *State v. Maynard*, 138 Or App 647, 656, 910 P2d 1115 (1996). Defendant subsequently was convicted by a jury of endangering the welfare of a minor. ORS 163.575(1)(a).

■      Defendant assigns error to the trial court's denial of his motion for acquittal. The state agrees with defendant that "the critical inquiry in this case is whether the legislature intended to prohibit conduct such as defendant's through ORS 163.575(1)(a)." Defendant argues that ORS 167.065-(1)(a) prohibits exposing minors to motion pictures depicting sexual conduct, but that most of that statute has been declared unconstitutional and the Oregon legislature has not rewritten it. Consequently, he contends, the state is attempting to "shoehorn" this prosecution into an inapplicable statute, ORS 163.575(1)(a). According to defendant, ORS 163.575(1)(a) establishes criminal culpability only for exposing a minor to *live* sexual conduct performed in the minor's view. The state responds that "[a] *recorded* act of sexual conduct remains an act of sexual conduct, notwithstanding that it is not performed live before the child." (Emphasis in original.)

Resolution of this case is a matter of statutory construction. Our goal is to discern the intent of the legislature as expressed in ORS 163.575(1)(a). *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). The first level of analysis is an examination of the statute's text and context. *Id*. at 610-11. If the intent of the legislature remains unclear, we examine the legislative history of the statute. *Id*. at 611-12. If the legislative history makes clear the legislature's intent, our inquiry is ended. *Id*. at 612.

ORS 163.575(1) provides, in part:

"(1)   A person commits the crime of endangering the welfare of a minor if the person knowingly:

"(a)   Induces, causes or permits an unmarried person under 18 years of age to *witness an act of sexual conduct* or sadomasochistic abuse as defined by ORS 167.060[.]"

(Emphasis supplied.) ORS 167.060(10) defines "sexual conduct" to include "human masturbation." The parties agree that the videotape that defendant showed the victim depicted "sexual conduct." The question is whether the words, "witness an act of sexual conduct," in ORS 163.575(1)(a) refer only to live sexual conduct or refer to any sexual conduct, including such conduct recorded on videotape.

In construing a statute, we give words their plain, natural and ordinary meaning. *Id.* at 310. The word "witness" means

"to see or know by reason of personal presence: have direct cognizance of: observe with one's own eyes or ears: be present as an observer at * * *."

*Webster's Third New Int'l Dictionary*, 2627 (unabridged ed 1993). According to the state, a person may observe an act with one's own eyes and ears whether the act is performed live or is recorded on videotape. However, the definition of "witness" includes, as defendant argues, personal presence as the act is being performed. A videotape may record an act, but that does not mean that the observer of the videotape is present for the performance of the act. The definition of the word "witness" strongly suggests that the legislature could have intended the words, "witness an act of sexual conduct," in ORS 163.575(1)(a), to refer to live sexual conduct. However, we do not rely on dictionary definitions as conclusive proof of legislative intent. *Massee and Massee*, 138 Or App 589, 595, 911 P2d 320, *rev allowed* 323 Or 483 (1996).

We next examine definitions contained in the statute and find that they do not clarify the legislature's intent in employing the word "witness" in ORS 163.575(1)(a). For example, ORS 167.060(10) defines "sexual conduct" for purposes of ORS 163.575(1)(a). ORS 167.060(6) defines "obscene performance" for purposes of ORS 167.060 to ORS 167.095. The definition of "obscene performance" specifically includes sexual conduct "whether pictured, animated or live." The definition of "sexual conduct" in ORS 167.060(10), by contrast, does not include "pictured, animated or live." The parties disagree about the significance of the differences in the definitions of "sexual conduct" and "obscene performance." Defendant argues that the legislature "understood the difference between live sexual conduct and sexual conduct contained in a motion picture" and embodied that difference in ORS 163.575(1)(a) and ORS 167.065(1)(a), respectively. According to defendant, the legislature in ORS 163.575(1)(a) intended to criminalize only the act of permitting a minor to see *live* acts of sexual conduct or sadomasochistic abuse. The state responds that because the potential harm that the legislature

sought to address in ORS 163.575(1)(a) is "preventing children's exposure to the particular sex acts involved, the statute is most reasonably read to include both types of experience." Both interpretations are plausible, and we conclude that the legislature's intent in employing the phrase, "witness an act of sexual conduct," in ORS 163.575(1)(a) is not clear. Consequently, we turn to legislative history.

Senate Bill 40 was part of the legislature's 1971 comprehensive revision of the Oregon Criminal Code. Section 177, "Offenses Against the Family," became ORS 163.575-(1)(a). Section 179, by contrast, contained prohibitions against obscenity that eventually became, in part, ORS 167.065, "Furnishing Obscene Materials to Minors." In their references to the legislative history of Senate Bill 40, both defendant and the state refer us to statements about the purpose of sections 177 and 179 contained in the commentary prepared by the Criminal Law Revision Commission. The commentary to section 177, for example, states that the proposed section "prohibits inducing, causing or permitting a person less than 18 years old to view an act of sexual conduct or sadomasochistic abuse." Commentary, Criminal Law Revision Commission, 1970, p 178. The commentary also declares that "[t]he subsection does not require participation or active conduct on the part of the minor; exposure to the prohibited acts is considered harmful per se." *Id.* Those explanations do not assist us in determining whether the legislature intended the phrase, "witness an act of sexual conduct" in section 177 to refer to live sexual conduct or to any sexual conduct.

However, our review of the legislative history provides a clear and unambiguous answer to the question. During a work session on Senate Bill 40, the Senate Committee on Criminal Law and Procedure considered an amendment proposed by Reginald S. Williams, representative for the Motion Picture Association. Williams proposed that the language contained in section 177(1)(a), which is presently contained in ORS 163.575(1)(a), be deleted. In his view, "the subject matter seems to be adequately covered in [Section 179]." Tape Recording, Senate Committee on Criminal Law and Procedure, March 26, 1971, Tape 13, Side I at 70-77. Donald

Paillette, Project Director of the Criminal Law Revision Committee and spokesperson for Senate Bill 40, explained that section 177 and 179 had different goals:

> "What we were getting at with 177—and I agree that there is some overlap—what we were talking about is an in-the-flesh kind of situation—a contributing to the delinquency of a minor-type of situation where its not a question of showing them a film, but it's a question of having—having minors witnessing the actual—the actual act that we were talking about—sexual conduct."

*Id.* During the ensuing discussion, an unidentified committee member stated that there might be a way to make it more clear that the conduct prohibited by section 177 did not include films, but added: "I was going to suggest '*live* sexual conduct,' but that might make [the statute] too racy. (Laughter)" *Id.* The committee did not consider Williams' amendment further, and subsection (1)(a) of section 177 was enacted as originally drafted.

■       Legislative history makes clear that the phrase, "witness an act of sexual conduct," in ORS 163.575(1)(a) refers to acts of live sexual conduct. Because it is undisputed that the victim did not witness an act of live sexual conduct, we conclude that the trial court erred in denying defendant's motion for judgment of acquittal on the charge of endangering the welfare of a minor by permitting an unmarried person under the age of eighteen years to witness an act of live sexual conduct.

In light of this disposition, we need not address defendant's other assignments of error.

Reversed and remanded for entry of judgment of acquittal.